UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| JULIE A. FALLON <br> (Social Security No. XXX-XX-1127), <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL J. ASTRUE, Commissioner of the <br> Social Security Administration, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) 3:10-cv-44-WGH-RLY <br> ) <br> ) <br> ) <br> ) <br> ) |

**MEMORANDUM DECISION AND ORDER**

This matter is before the Honorable William G. Hussmann, Jr., United States Magistrate Judge, upon the Consents filed by the parties (Docket Nos. 13, 16) and an Order of Reference entered by Chief District Judge Richard L. Young on May 26, 2010 (Docket No. 17).

**I. Statement of the Case**

Plaintiff, Julie A. Fallon, seeks judicial review of the final decision of the agency, which found her not disabled and, therefore, not entitled to Disability Insurance Benefits ("DIB") under the Social Security Act ("the Act"). 42 U.S.C. §§ 416(i), 423(d); 20 C.F.R. § 404.1520(f). The Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

Plaintiff applied for DIB on December 4, 2006, alleging disability since April 15, 2003. (R. 150-52). The agency denied Plaintiff's applications both initially and on reconsideration. (R. 91-94, 99-105). Plaintiff appeared and testified at a

hearing before Administrative Law Judge D. Arline Colon ("ALJ") on March 4, 2009. (R. 40-88). Plaintiff was represented by an attorney; also testifying was a vocational expert. (R. 40). On March 17, 2009, the ALJ issued his opinion finding that Plaintiff was not disabled because she retained the residual functional capacity ("RFC") to perform a significant number of jobs in the regional economy. (R. 30-39). The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner. (R. 1-3). 20 C.F.R. §§ 404.955(a), 404.981. Plaintiff then filed a Complaint on March 17, 2010, seeking judicial review of the ALJ's decision.

## II. Statement of the Facts

### A. Vocational Profile

Born on April 21, 1981, Plaintiff was 27 years old at the time of the ALJ's decision, with a high school education. (R. 38-39). Her past relevant work experience included jobs as an office manager (sedentary/skilled), customer services representative (light/skilled), cosmetologist (light/skilled), industrial/commercial cleaner (heavy/unskilled), sheet rock applicator (medium/unskilled), and certified nurses' assistant (medium/skilled). (R. 37).

### B. Medical Evidence

#### 1. Plaintiff's Impairments

On April 23, 2003, Phillip Pryor, M.D., performed a surgical lumbar fusion, bone graft, and laminectomy at the L5-S1 level of Plaintiff's spine. (R. 268-71).

On May 17, 2006, Plaintiff saw William Blanke, M.D., to establish care and complained that her left hip had been grinding for quite some time. (R. 317).

-2-

Dr. Blanke observed that Plaintiff had some right iliac and right thigh tenderness, but a good range of motion and strength in all of her major muscle groups. (R. 317).

On October 31, 2006, Plaintiff complained of radiating neck pain to Dr. Blanke. (R. 313). Dr. Blanke observed that Plaintiff had a limited range of rotation in her neck; muscle spasms and tenderness in her shoulder blades; and diminished reflexes in her triceps and forearms, but normal muscle strength and sensation. (R. 313). He diagnosed Plaintiff with a muscle spasm; prescribed a muscle relaxant; indicated that he would see her again as needed; and assured her that she showed no evidence of cervical disc disease. (R. 313).

On November 6, 2006, Plaintiff visited Dr. Pryor with complaints of occasional off-and-on achiness in her lower back. (R. 260-61). She complained that over the previous three months, she had constant right lower back pain in the lumbosacral area of her spine, but no lower extremity pain or radicular symptoms. (R. 260). She rated her level of pain as ranging from three to eight on a scale of one to ten. (R. 260). Plaintiff reported that she took either Lortab or Percocet before bed and Ibuprofen during the day. (R. 260). Dr. Pryor observed that Plaintiff had tenderness in her right lower back, but a full range of motion, intact motor roots through her lower spine, a negative straight leg raising test in both legs, and normal sensation and reflexes. (R. 260). He recommended that Plaintiff get a lumbar CT scan. (R. 261).

A CT scan from November 17, 2006, of Plaintiff's lower back showed a possible pars defect at the L5 level on the left, but no spinal canal or foraminal

compromise. It also showed mild lucency (a sign of possible loose hardware) around the screws at the S1 level, indicating motion. (R. 263-64). Also on November 17, Michael Payne, M.D., examined Plaintiff for complaints of chronic right-sided lower back pain which radiates into the right hip. (R. 265-67). Dr. Payne noted that Plaintiff had a decreased range of motion in her lumbar spine and a somewhat slow gait with a definite right-sided limp, but normal strength, except for a slight hint of weakness upon backward flexing on her right side, and normal reflexes, sensation, and motor functions. (R. 265). He diagnosed Plaintiff with chronic lumbar radicular symptoms secondary to lumbar spondylosis and administered an epidural steroid injection in her lower back. (R. 265-67).

On January 17, 2007, Plaintiff complained to Dr. Pryor of "some S1 symptoms" and occasional numbness in her legs. (R. 325). Dr. Pryor found a normal neurological exam. He detected some tenderness and a reduced range of motion in Plaintiff's lower back, but a negative straight leg raising test and normal muscle strength. (R. 325). CT exam of her spine showed no nerve impingement. Dr. Pryor refilled her prescription for Lortab, but limited her to no more than two daily. (R. 325).

On February 16, 2007, consultative physician John Hall, M.D., examined Plaintiff. (R. 273-75). Plaintiff complained of pain in her lower back, hip, and legs. (R. 273). She reported that she took Percocet and Lortab as needed for pain and that epidural injections did not provide much relief. (R. 273). Plaintiff indicated that she worked on Saturdays as a hair stylist. (R. 273). Dr. Hall

noted that Plaintiff reported headaches, numbness in her legs and difficulty walking, with pain in her feet, legs, and back. (R. 273). Dr. Hall observed that Plaintiff could squat, but had to use her arms to get upright; had positive straight leg raising at 80 degrees on the left; and had a "fairly significant" decreased range of motion in her lumbar area, but could walk on her heels, toes, and tandemly; could button, zip, and pick up coins; and had full muscle strength with a normal gait and station and normal reflexes. (R. 273). Dr. Hall diagnosed Plaintiff with low back pain; he opined that it would be difficult for her to stand or walk for two hours in an eight-hour day; and he opined that she could sit, stand, lift, carry, and handle objects, but that her pain would limit her. (R. 274).

On March 14, 2007, Plaintiff saw Dr. Pryor and complained of pain in her right posterior iliac crest radiating to her right thigh; usually not much back pain but occasional lumbosacral pain; and "tolerable" "achy tension" between her shoulder blades. (R. 300). Plaintiff reported that she usually took one or two Lortab daily and took Percocet twice monthly only when her pain was severe. Dr. Pryor observed that Plaintiff was very tender in a portion of her right iliac crest and had limited range of motion in a portion of her right pelvis, but had a normal gait, neurological examination, and sensation. (R. 330). Dr. Pryor reviewed x-rays which revealed no degeneration above the surgically repaired portion of her spine and normal pelvis, and he opined that her pain was adequately managed by medication. He indicated that he would see her again on an as-needed basis. (R. 300).

On June 15, 2007, Plaintiff saw Dr. Pryor and complained of right pelvis pain; back pain that was symptomatic mostly with cold weather and was currently asymptomatic; and burning right thigh pain that worsened with extensive sitting or driving. (R. 412-13). Dr. Pryor observed that Plaintiff was very tender in her lower right back and portions of her right pelvis and that trunk range of motion produced pain in these areas upon extension, but that she had a negative straight leg raising test and normal sensation. (R. 412). He opined that a recent X-ray showed a disc bulge at L4-5 with mild foraminal encroachment, but no lucency at the S1 screw, which would have been a sign that her spinal fusion at L5-S1 was not solid. (R. 412). He further opined that she had no clear radicular pain. (R. 412). Dr. Pryor refilled Plaintiff's Lortab; noted that she took one or two Lortab daily; and reported that she was "fully functional doing this." (R. 413). He indicated he would see her again in six months. (R. 413).

On March 12, 2008, Plaintiff saw Dr. Pryor and complained of pain in her right posterior iliac crest with some pain in her right buttock and burning in her right thigh. (R. 410-11). She indicated that her condition had not significantly changed since June 2007. (R. 410). Plaintiff reported that the pain worsened with cold weather, standing on her feet for long hours, and sitting in her car for extended periods of time, but that the pain improved when she lied down or put a pillow between her flexed knees. (R. 410). She reported taking one or sometimes two Lortab and only occasionally took Percocet when the pain was severe. She also reported that she was still working and had no other recent treatment. (R. 410). Dr. Pryor observed that Plaintiff had tenderness in her neck, shoulder

-6-

blades, lower back, and right iliac crest; muscle spasms between her shoulder blades; pain in her lower back with some ranges of motion; and a mildly antalgic gait, but a normal heel-and-toe walk, a negative straight leg raising test, and normal sensation. (R. 410). Dr. Pryor could not definitively determine from a recent X-ray whether Plaintiff's lumbar spine was solidly fused at the L5-S1 level, but he opined that the X-ray showed no spinal instability or significant narrowing. (R. 411). He diagnosed Plaintiff with degenerative disc disease with mild to moderate symptoms; opined that her pain was "not bad enough" to consider injections or further diagnostic studies; continued her on no more than two Lortab daily and less than one Percocet weekly; and indicated he would see her again as needed. (R. 411).

On April 16, 2008, Plaintiff complained to Dr. Pryor of severe pain in her right buttock radiating to her right thigh. (R. 357). She reported that for the last two weeks she had begun taking pain medication during the day, but had not previously done so. (R. 357). Dr. Pryor observed that Plaintiff's back was quite tender, especially near the surgical screw at the L5 level; that straight leg raising produced pain in her right thigh at 80 degrees; and that her gait was mildly antalgic, but that she had no motor or sensory defects. (R. 357). He referred Plaintiff for an epidural injection; prescribed Percocet; and ordered an MRI of her lumbar spine. (R. 357). An MRI of Plaintiff's lumbar spine performed on April 28, 2008, showed a broad-based disc protrusion at the L4-5 level, but was otherwise normal. (R. 347).

On July 21, 2008, Plaintiff saw Dr. Payne for a lumbar epidural injection at the L4-5 level of her lumbar spine. (R. 414-15). Dr. Payne reported that she had underwent a steroid injection three months earlier with "excellent relief." (R. 414). Dr. Payne noted that Plaintiff had diffuse tenderness and decreased flexion in her lower back; a positive straight leg raising test on the right; and a slow gait with a definite limp toward the right side, but no muscle spasm or bony abnormalities and intact sensation, motor function, muscle strength, and reflexes. (R. 414). He diagnosed Plaintiff with chronic lumbar radicular syndrome secondary to lumbar spondylosis at L4-5. (R. 414).

On January 5, 2009, Dr. Pryor opined that Plaintiff could occasionally lift 20 pounds; frequently lift ten pounds; stand or walk for at least two hours in an eight-hour day; periodically alternate between sitting and standing; frequently balance, but never stoop, crouch, crawl, climb, or kneel; and could reach and handle without limitation. (R. 397-401). He further opined that Plaintiff's back pain limited her exposure to temperature extremes, vibration, and hazards, and that these factors increased the pain. (R. 401).

Also on January 5, 2009, Plaintiff saw Dr. Payne's associate, Weldon Egan, M.D., for a lumbar epidural injection. (R. 662). Dr. Egan explained that Plaintiff had undergone previous injections with "fairly good results." Dr. Egan noted that Plaintiff had a somewhat limited range of motion in her lower back; a positive straight leg raising test on the right; some difficulty heel-and-toe walking on the right side; and a gait with a limp that favored her right leg, but no muscle spasm or sensory or motor change. (R. 662). He likewise diagnosed Plaintiff with

-8-

chronic lumbar radicular syndrome secondary to lumbar spondylosis at L4-5. (R. 662).

On January 9, 2009, Dr. Pryor wrote a letter in which he opined that Plaintiff "must alternate sitting, standing and lying down in an 8 hour day to alleviate her pain." (R. 476).

### 2. State Agency Review

On March 8, 2007, state agency reviewing physician M. Brill, M.D., completed a Physical Residual Functional Capacity Assessment in which he opined that Plaintiff could perform an unrestricted range of medium work with no postural limitations. (R. 286-93). On May 22, 2007, Fernando Montoya, M.D., reviewed all of the evidence in Plaintiff's file and affirmed Dr. Brill's opinion as written. (R. 301).

### III. Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997). This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility. *Richardson,* 402 U.S. at 399-400. Accordingly, this Court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the

Commissioner. *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits. *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

## IV. Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that she suffers from a "disability" as defined by the Act. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations set out a sequential five-step test the ALJ is to perform in order to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The ALJ must consider whether the claimant: (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform his past relevant work; and (5) is unable to perform any other work existing in significant numbers in the national economy. *Id.* The burden of proof is on Plaintiff during steps one through four, and only after Plaintiff has reached step five does the burden shift to the Commissioner. *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

## V. The ALJ's Decision

The ALJ concluded that Plaintiff was insured for DIB through September 30, 2011; Plaintiff also had not engaged in substantial gainful activity since the alleged onset date. (R. 32). The ALJ found that, in accordance with 20 C.F.R. § 404.1520, Plaintiff had five impairments that are classified as severe: gastrointestinal dysfunction; degenerative disc disease with a psuedoarthosis post L5-S1 spinal fusion; chronic lumbar radicular symptoms secondary to lumbar spondylosis at L4-5; left foot plantar fasciitis; and history of right shoulder arthroscopy with debridement. (R. 32). The ALJ concluded that these impairments did not meet or substantially equal any of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 34). Additionally, the ALJ opined that Plaintiff's allegations regarding the extent of her limitations were not fully credible. (R. 35). Consequently, the ALJ concluded that Plaintiff retained the RFC for sedentary work except she would need the ability to stand or shift positions for one or two minutes after maintaining a position for 30-45 minutes; she could occasionally stoop, frequently balance, never kneel, crouch, crawl, or climb; she could frequently overhead reach and push or pull with her lower extremities; she could have no concentrated exposure to vibration or temperature extremes; she could not do work that involved strict production demands; and she would need two extra restroom breaks for five minutes. (R. 34). The ALJ opined that Plaintiff could not perform her past work. (R. 37). However, Plaintiff could perform a substantial number of jobs in the economy including clerk typist

(1,194 jobs), data entry clerk (1,966 jobs), and receptionist (11,937 jobs). (R. 38). The ALJ concluded by finding that Plaintiff was not under a disability. (R. 39).

## VI. Issue

Plaintiff has essentially raised one issue. The issue is as follows:

**Whether *all* of Dr. Pryor's opinions are entitled to controlling weight.**

Plaintiff's lone argument is that the ALJ erred by failing to incorporate all of the limitations listed by Dr. Pryor into his assessment of Plaintiff's RFC. Opinions of a treating physician are generally entitled to controlling weight. *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2000). However, an ALJ may reject the opinion of a treating physician if it is based on a claimant's exaggerated subjective allegations, is internally inconsistent, or is inconsistent with other medical evidence in the record. *Dixon v. Massanari,* 270 F.3d 1171, 1177-78 (7th Cir. 2001). Additionally, 20 C.F.R. § 404.1527 provides guidance for how the opinions of treating and nontreating sources are to be evaluated and explains as follows:

> (d) How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> > (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> >
> > (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s)

and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) Length of the treatment relationship and the frequency of examination. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(ii) Nature and extent of the treatment relationship. Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain. When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical

signs and laboratory findings, the more weight we will give that
opinion. The better an explanation a source provides for an
opinion, the more weight we will give that opinion.
Furthermore, because nonexamining sources have no
examining or treating relationship with you, the weight we will
give their opinions will depend on the degree to which they
provide supporting explanations for their opinions. We will
evaluate the degree to which these opinions consider all of the
pertinent evidence in your claim, including opinions of treating
and other examining sources.

(4) Consistency. Generally, the more consistent an opinion is
with the record as a whole, the more weight we will give to that
opinion.

(5) Specialization. We generally give more weight to the
opinion of a specialist about medical issues related to his or
her area of specialty than to the opinion of a source who is not
a specialist.

(6) Other factors. When we consider how much weight to give
to a medical opinion, we will also consider any factors you or
others bring to our attention, or of which we are aware, which
tend to support or contradict the opinion. For example, the
amount of understanding of our disability programs and their
evidentiary requirements that an acceptable medical source
has, regardless of the source of that understanding, and the
extent to which an acceptable medical source is familiar with
the other information in your case record are relevant factors
that we will consider in deciding the weight to give to a medical
opinion.

20 C.F.R. § 404.1527.

The ALJ, in this case, reasonably rejected two of Dr. Pryor's opinions: that Plaintiff required the ability to alternate between sitting, standing, and lying down during an eight-hour workday; and that Plaintiff could never stoop. The sources of these opinions are a form Dr. Pryor filled out on January 5, 2009, in which he found that Plaintiff could never stoop (R. 397-401) and a letter dated January 9, 2009, in which he opined that Plaintiff would need to alternate between sitting,

standing, and lying down (R. 476). The ALJ rejected these two opinions as being unsupported by the medical evidence of record as well as Plaintiff's daily activities. (R. 37). Instead, the ALJ found that Plaintiff could stoop occasionally and needed the ability to alternate between sitting and standing for one or two minutes every 30-45 minutes. (R. 34).

There are legitimate reasons why the ALJ did not afford all of Dr. Pryor's opinions controlling weight. Four days prior to Dr. Pryor rendering the opinion that Plaintiff would need to alternate between sitting, standing, and lying down, he had opined that Plaintiff would need to alternate only between sitting and standing and made no mention of lying down. (R. 397-401). In March 2007, Dr. Pryor opined that Plaintiff's pain was adequately managed with medication. (R. 300). Additionally, in June 2007, Dr. Pryor indicated that Plaintiff was "fully functional" using pain medication. (R. 413). And, Dr. Prior has, on many occasions, found relatively normal objective medical results including in November 2006 (R. 260-61), January 2007 (R. 325), March 2007 (R. 300), June 2007 (R. 412-413), and March 2008 (R. 410-11). This is more than enough objective medical evidence to conclude that Dr. Pryor's opinions about stooping and lying down were internally inconsistent. Furthermore, the opinions of Dr. Pryor were not supported by other evidence in the record. Consultative examiner Dr. Hall found no need to alternate between sitting, standing, and lying down (R. 273-75) and state agency physicians found that Plaintiff could perform medium work with no postural limitations. (R. 286-93, 301). Finally, Dr. Pryor's opinions were not supported by Plaintiff's actual daily activities. The record indicates that

standing, and lying down (R. 476). The ALJ rejected these two opinions as being unsupported by the medical evidence of record as well as Plaintiff's daily activities. (R. 37). Instead, the ALJ found that Plaintiff could stoop occasionally and needed the ability to alternate between sitting and standing for one or two minutes every 30-45 minutes. (R. 34).

There are legitimate reasons why the ALJ did not afford all of Dr. Pryor's opinions controlling weight. Four days prior to Dr. Pryor rendering the opinion that Plaintiff would need to alternate between sitting, standing, and lying down, he had opined that Plaintiff would need to alternate only between sitting and standing and made no mention of lying down. (R. 397-401). In March 2007, Dr. Pryor opined that Plaintiff's pain was adequately managed with medication. (R. 300). Additionally, in June 2007, Dr. Pryor indicated that Plaintiff was "fully functional" using pain medication. (R. 413). And, Dr. Prior has, on many occasions, found relatively normal objective medical results including in November 2006 (R. 260-61), January 2007 (R. 325), March 2007 (R. 300), June 2007 (R. 412-413), and March 2008 (R. 410-11). This is more than enough objective medical evidence to conclude that Dr. Pryor's opinions about stooping and lying down were internally inconsistent. Furthermore, the opinions of Dr. Pryor were not supported by other evidence in the record. Consultative examiner Dr. Hall found no need to alternate between sitting, standing, and lying down (R. 273-75) and state agency physicians found that Plaintiff could perform medium work with no postural limitations. (R. 286-93, 301). Finally, Dr. Pryor's opinions were not supported by Plaintiff's actual daily activities. The record indicates that

Plaintiff watches her two toddler/preschooler children during the week and worked approximately 14 hours as a cosmetologist during the weekend. (R. 273, 468). There is some evidence in the medical records that indicates that Plaintiff was even watching four children at times. (R. 340). The Court is reminded that it may not re-weigh the evidence. Consequently, the Court concludes that given Plaintiff's daily activities, the internal inconsistencies in Dr. Pryor's opinions, and the fact that Dr. Pryor's opinions were not consistent with other objective medical evidence, the Court concludes that Dr. Pryor's opinions were not entitled to controlling weight and the ALJ's decision is supported by substantial evidence.

## VII.  Conclusion

The ALJ properly considered Dr. Pryor's opinions about Plaintiff's ability to stoop and her need to alternate between sitting, standing, and lying down and reasonably determined that they were not entitled to controlling weight. The final decision of the Commissioner is, therefore, **AFFIRMED.**

**SO ORDERED** the 26th day of January, 2011.

William G. Hussmann, Jr.
United States Magistrate Judge
Southern District of Indiana

**Electronic copies to:**

Lane C. Siesky
SIESKY LAW FIRM, PC
lane@sieskylaw.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov